KAREN MATTESON (Cal. Bar No. 102103)
Email: mattesonk@sec.gov
JACOB A. REGENSTREIF (Cal. Bar No. 234734)
E-mail: regenstreifj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Lorraine B. Echavarria, Associate Regional Director
John W. Berry, Regional Trial Counsel
444 South Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>EFSTRATIOS "ELIAS" D. ARGRYROPOULOS and PRIMA CAPITAL GROUP, INC.,<br><br>Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

2. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because at all relevant times the individual defendant resided in this district, the entity defendant was headquartered in this district, and certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

3. This case involves fraud perpetrated by the Defendants in the offer and sale of pre-IPO Facebook and pre-IPO Twitter shares in the secondary market. From October 2010 through October 2013, the Defendants raised $3,435,406 from 143 investors, promising to use those funds to purchase shares of Facebook and Twitter stock before their initial public offerings, or "IPOs." Instead of purchasing the shares as promised, the Defendants misappropriated investor funds, using them primarily to day trade stocks and options and to pay off certain investors, including investors who complained when the Defendants failed to deliver the promised shares.

4. By engaging in this conduct, Defendants have violated the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, and the broker-dealer registration requirement of Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1). The SEC seeks permanent injunctions and disgorgement with prejudgment interest against both Defendants and, as to Defendant Argyropoulos, a civil penalty.

## DEFENDANTS

5. **Efstratios "Elias" D. Argyropoulos**, resides in Santa Barbara, California. Argyropoulos is the founder, president and sole shareholder of Prima Capital Group, Inc. ("Prima"), and controls Prima's operations. In 1983, the NASD censured and fined Argyropoulos, who was then associated with a

registered broker-dealer, for depositing personal funds into a customer's account to cover losses generated in the account. In 1995, the NASD censured, barred, and fined Argyropoulos $200,000 for use of discretion over client accounts without written authority from the clients, unauthorized and unsuitable transactions, sharing and guaranteeing customers' losses, and manipulation and deceptive practices. Argyropoulos is not registered with the SEC in any capacity.

6. **Prima Capital Group, Inc.** is a Delaware corporation with its principal place of business in Santa Barbara, California. Prima is not registered with the SEC in any capacity.

## THE FRAUDULENT SCHEME

**A. The Defendants Fraudulently Offer and Sell Facebook Investments**

7. From October 2010 to May 2012, Defendants solicited investors by email to purchase pre-IPO Facebook shares, raising at least $3,082,244 from 130 investors.

**1. The Defendants Fraudulently Raise and then Misappropriate Investor Funds after Depositing them with Broker Felix Investments, Inc.**

8. In late October 2010, Argyropoulos sent an email solicitation to a list of potential investors. Argyropoulos represented that Prima was working closely with Felix Investments, Inc. ("Felix"), a broker-dealer registered with Plaintiff SEC, to purchase Facebook shares sold by Facebook's employees, advisors, and contractors. Argyropoulos' solicitation noted that the "exciting" offering could rival Google's market capitalization and that investors could "pick up [Facebook] shares at a bargain."

9. Argyropoulos' email solicitation further stated that for an "upfront modest finders [*sic*] fee," Prima would take an investment in any amount and pool it with other investments to create a single large position in the Facebook shares. According to Argyropoulos' email, this would allow Prima's investors to

participate in the secondary market established by Felix, which participation required a $100,000 minimum investment.  The price investors were to pay for the alleged purchase of Facebook shares included an additional mark-up to the share price Felix purportedly charged Prima for the shares.

10. The Defendants raised over $1,294,805 from at least 53 investors nationwide pursuant to Argyropoulos' email solicitation.

11. Once an investor sent funds to Prima for investment, Argyropoulos provided the investor with an "Acknowledgment of Receipt" of funds.  The Acknowledgment listed the amount the investor had invested with Prima and the number of actual Facebook shares the investor purportedly purchased.  The Acknowledgements did not disclose the amount Prima purportedly paid for the Facebook shares or the amount of the mark-up the investor was paying.  Additionally, instead of depositing investor funds in a separate account for investment with Felix, Argyropoulos simply commingled investor monies with other monies in Prima's bank account.

12. According to the email solicitation and the Acknowledgment, Facebook shares stayed "under the Prima umbrella" until either: (1) Facebook was acquired; or (2) Facebook went public.  The Acknowledgement further stated that when either of these events occurred, the Facebook shares would be distributed to investors.  Argyropoulos also promised investors in the Acknowledgement that if they wanted to exit the investment before Facebook was acquired or went public, Prima would buy the investor's Facebook position or find another investor to buy it.  Argyropoulos repeated these representations to investors through email and over the telephone.

13. Beginning in late 2010 and through April 2011, Prima deposited $1,294,805 million of investor funds in Facie Libre Associates II, LLC ("Facie Libre"), a fund established by Felix to hold Facebook shares purchased in the secondary market.   Prima made these deposits purportedly pursuant to a

subscription agreement it had entered into with Facie Libre. Defendants did not disclose to Felix that the monies deposited with Facie Libre belonged to individual investors solicited by the Defendants.

14. On March 1, 2011, Felix's outside counsel sent Argyropoulos an email stating that Felix had learned that Prima and Argyropoulos were making false and misleading representations to potential investors that implied that Prima was acting as Felix's agent or representative. On March 21, 2011, Argyropoulos received another letter from Felix's counsel demanding confirmation that Prima had not transferred interests in Facie Libre to third parties, was still a qualified purchaser, and had not violated Facie Libre's operating agreement and subscription documents. On June 16, 2011, despite false representations by Argyropoulos that Prima was not transferring shares to third parties, Facie Libre terminated Prima's membership based upon its conclusion that Prima had breached its subscription agreement with Facie Libre and fraudulently represented to Facie Libre that it was not investing others' monies. Facie Libre sought and received Argyropoulos' acknowledgement that Prima's membership was rescinded along with a general release from liability.

15. On June 23, 2011, following Argyropoulos' return of the signed release, Facie Libre wired $1,294,805 – the entire amount of Prima's investment in the fund – back to Prima's bank account. Argyropoulos immediately transferred $625,000 of the returned funds to Prima's brokerage account, repaid $637,841 to a select group of Prima's Facebook investors, and misappropriated the remaining $31,964 of investor funds. Argyropoulos used the $625,000 in Prima's brokerage account to day trade stocks and options, resulting in the loss of substantially all of the funds. Argyropoulos commingled the $31,964 of investor funds with other funds in Prima's bank account and used the money to pay his personal expenses.

///

///

16. The Defendants then subjected certain Prima investors whom the Defendants did not repay to a "bait and switch" tactic. Argyropoulos represented to investors who complained about their missing Facebook shares that they could substitute their investment in Facebook with shares in E-Waste Asset Recovery, Inc., a start-up company that Argyropoulos founded purportedly to recycle electronic waste. Prima and Argyropoulos falsely represented to at least one investor that he would make fifty times his original Facebook investment with the E-Waste shares, when Argyropoulos had no basis for making such a representation.

**2.     The Defendants Fraudulently Raise and then Misappropriate Investor Funds after Depositing them with SharesPost, Inc.**

17. Beginning in March 2011, Argyropoulos again solicited investments by email, representing that Prima had some "amazing" pre-IPO opportunities in fast growing technology companies, and that its ongoing project was Facebook. The Defendants raised over $1,031,138 from at least 32 investors nationwide pursuant to Argyropoulos' March 2011 email solicitation.

18. In March 2011, Argyropoulos, on Prima's behalf, entered into a relationship with SharesPost, an online platform supporting the purchase and sale of private company stock. Similar to the arrangement with Felix, using investor monies, the Defendants bought units in Prima's name in six single purpose funds established by SharesPost that entitled Prima to Facebook shares purchased through auctions in the secondary market. These funds were SP Private Investments II, LLC; SP Private Investments III, LLC; SP Private Investments VI, LLC; SP Private Investments IX, LLC; SP Private Investments XI, LLC; and SP Private Investments XIX, LLC.

19. Once investors sent money to Prima for investment, Prima then provided at least some investors with an "Acknowledgment of Receipt" of funds. The Acknowledgment listed the total amount the investor had invested with Prima,

which included an unspecified mark-up by the Defendants added to the undisclosed share price SharesPost charged Prima, and the number of Facebook shares the investor purportedly purchased. This Acknowledgment stated that shares would "stay under the Prima umbrella with Sharespost [*sic*] in a Limited Liability Company called SP Private Investments, LLC-Facebook" until either: (1) Facebook was acquired; or (2) Facebook went public, and that once either of these events occurred, a distribution of shares would be made to investors either when Facebook was acquired or six months after Facebook went public.

20. From March 2011 to May 2012, Prima made seven investments totaling $1,031,138 in the six SharesPost investment funds. Prima received 24,982 units in the SharesPost investment funds after SharesPost's fees were paid.

21. On July 9, 2012, undisclosed to investors, Prima sold 16,202 units from the six SharesPost investment funds to a Canadian investment fund. Prima executed an agreement assigning these units to the Canadian investment fund for $25 per unit, constituting a total purchase price of $405,050. SharesPost escrowed the funds received from the Canadian investment fund for this transaction and then wired the money to Prima. Argyropoulos immediately misappropriated most of the funds by wiring $320,000 of the sale proceeds to Prima's brokerage account, which was under his sole control. Argyropoulos proceeded to use the $320,000 to day trade stocks and options, resulting in the loss of substantially all of the funds.

22. The Defendants then attempted to convince investors to change their investments and take shares in other companies in lieu of Facebook shares, without disclosing that Prima had sold two-thirds of its SharesPost units for substantially less than it had paid for them. In November 2012, the remaining units in the SharesPost investment funds which had not been sold to the Canadian investment fund were converted into 8,721 Facebook shares and deposited into an account Prima maintained with SharesPost. Argyropoulos then transferred the 8,721

1 Facebook shares to Prima's brokerage account and transferred some of the shares
2 to a select group of Prima investors.

3  23. Argyropoulos lied to investors about what had happened to their
4 money. For example, Argyropoulos wrote in an email to one investor who was
5 seeking return of his money:

> As we took money in we immediately sent it out. Your group's
> $300,000 went to Shares Post [*sic*] immediately. The net effect
> on us is we are short Facebook, not long. We are not holding
> on to your money!! This is why I said, with one entity failing
> to deliver, it put Prima in a precarious position.

**3.  Argyropoulos Misappropriates an Additional $756,301 from Facebook Investors**

24. Of the $3,082,244 the Defendants raised from Facebook investors, the Defendants initially invested $1,294,805 with Felix and $1,031,138 with SharesPost, and misappropriated most of these monies, as alleged above. Defendant Argyropoulos also misappropriated and misused the remaining $756,301, including by compensating himself with certain of these funds as purported "mark-ups" for his services and by commingling the remainder with other funds in Prima's bank account and using funds from that Prima account to pay his personal expenses.

**B.  The Defendants Fraudulently Offer and Sell Twitter Investments**

25. From July 2013 through October 2013, Prima and Argyropoulos solicited investors by email to purchase pre-IPO Twitter shares. Prima and Argyropoulos raised $341,562 in cash from 11 investors for pre-IPO Twitter shares. In addition, Argyropoulos lulled three existing Prima investors to convert their existing investments in other entities, including Facebook, into pre-IPO Twitter shares. These additional noncash investments (excluding the existing Facebook investment) totaled $11,600, making the total amount invested by

investors in pre-IPO Twitter shares $353,162. The Defendants represented to each of these 14 investors, in an emailed Acknowledgement of Receipt sent by Argyropoulos, that the investor had purchased shares of Twitter from Prima for $28 per share, which price included an unspecified "modest finders [*sic*] fee." The Acknowledgement of Receipt further represented that the shares would be held "under the Prima umbrella with SharesPost," until either: (1) Twitter was acquired; or (2) Twitter went public. The Acknowledgement further represented that Twitter shares would be distributed to investors when either Twitter was acquired or six months after Twitter went public. Argyropoulos also promised investors in the Acknowledgement that if they wanted to exit the investment before Twitter was acquired or went public, Prima would try to find another investor to buy the investor's Twitter position. Argyropoulos repeated these representations to investors through email and over the telephone.

26. In fact, the Defendants never purchased Twitter shares, and never placed any investor funds with SharesPost. In addition, no refund has been made to any of the 14 investors. Of the $341,562 raised in cash and deposited by Argyropoulos into Prima's bank account, Argyropoulos misappropriated $195,000 of the Twitter investors' funds by wire transferring them to Prima's brokerage account and using them for his personal trading. Argyropoulos misappropriated the remaining $146,562 of investor funds by using them for his personal expenses.

**C.    The Defendants Profit from Their Fraud**

27. The Defendants received at least $3,435,406 from investors seeking to invest in pre-IPO Facebook or Twitter shares.

28. Because the Defendants returned only $637,841 to some investors, their net ill-gotten gain was $2,797,565.

///
///
///

## FIRST CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a) of the Securities Act**

**(Against All Defendants)**

29. The SEC realleges and incorporates by reference paragraphs 1 through 28 above.

30. The Defendants, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a. with scienter, employed devices, schemes, or artifices to defraud;

    b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

31. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against All Defendants)**

32. The SEC realleges and incorporates by reference paragraphs 1 through 28 above.

33. The Defendants, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities

of a national securities exchange, with scienter:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

34. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

### Failure to Register as a Broker or Dealer

### Violations of Section 15(a)(1) of the Exchange Act

### (Against All Defendants)

35. The SEC realleges and incorporates by reference paragraphs 1 through 28 above.

36. The Defendants, by engaging in the conduct described above, made use of the mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce, the purchase or sale of securities, without being registered as brokers or dealers in accordance with Section 15(b) of the Exchange Act, 15 U.S.C. § 78o(b).

37. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

### II.

Issue a judgment, in a form consistent with Fed. R. Civ. P. 65(d) permanently enjoining Defendants, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Sections 10(b) and 15(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) & 78o(a), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

### III.

Order Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest.

### IV.

Order Defendant Argyropoulos to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

### V.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

///
///
///
///
///

## VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: December 23, 2014                    Respectfully submitted,

*/s/ Jacob A. Regenstreif*
Karen Matteson
Jacob A. Regenstreif
Attorneys for Plaintiff
Securities and Exchange Commission